**FILED**

JUN 2 3 2010

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

# THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA



Case: 1:10-cv-01059
Assigned To : Kollar-Kotelly, Colleen
Assign. Date : 6/23/2010
Description: Pro Se Gen. Civil

| | | |
|---|---|---|
| LEICESTER BRYCE STOVELL | | |
| 631 12TH STREET, N.E. | | |
| WASHINGTON, D.C. 20002 | | |
| (202) 302-0657 | ) | |
| Plaintiff | ) | JUDGE |
| | ) | |
| VS. | ) | |
| | ) | COMPLAINT |
| GLORIA M. JAMES | ) | |
| 3300 GREY VILLAGE AVENUE | ) | TYPE: |
| AKRON, OHIO 44319 | ) | COMMON LAW FRAUD, |
| | ) | MISREPRESENTATION |
| | ) | BREACH OF ORAL CONTRACT, |
| LEBRON R. JAMES, SR. | ) | DEFAMATION, |
| 4157 IDLEBROOK DRIVE | ) | ESTABLISHMENT OF |
| BATH TOWNSHIP, OHIO 44333 | ) | PATERNITY |
| Defendants | ) | JURY DEMAND |
| | ) | |

******

2

COMPLAINT

Now comes Plaintiff Leicester Bryce Stovell, proceeding pro se, who for his Complaint against Defendants Gloria M. James and LeBron R. James Sr. states the following:

## BACKGROUND

1. I, Plaintiff Leicester Bryce Stovell, am an attorney who has resided in Greater Washington, D.C. since November, 1983. I was born and raised in Ohio, received my bachelor's degree from Princeton University in 1976 and my law degree from the University of Chicago in 1980. During the past couple of years I have concluded that I have a reasonable basis for believing that I likely am the father of Defendant LeBron James, notwithstanding long-term actions of the Defendants aimed at preventing me and others from becoming aware of it.

2. Defendant Gloria James, a resident of Akron, Ohio, is the mother of Defendant LeBron James. She, acting directly and/or through her agents, has refused to allow the identification of his father since the time of his birth until the present day.

3. Defendant LeBron James, a resident of Bath Township, Ohio, is the world famous professional basketball player. Additionally, it is overwhelmingly likely that he is the son of me and Defendant Gloria James. He also likely is aware that I am his father. Yet, due to anger at perceived abandonment and conflict arising from his image as a successful fatherless child from the projects, he has come to direct and control, conspire in, or knowingly or recklessly aid and abet his mother's unjustifiable attempts to prevent the acknowledgment that I am his father.

THE 1984 ENCOUNTERS WITH DEFENDANT GLORIA JAMES

4. In or about mid-March, 1984, I met Defendant Gloria James at a restaurant/bar in the District of Columbia named "DC Space." We socialized there for a couple of hours that evening. Defendant Gloria James advised me she was from Akron, Ohio, had a job there, and that she was in her early twenties. I told her I was born and raised in Ohio and am an attorney in Washington, D.C. At the time I was 29 years old.

5. Later that evening, Defendant Gloria James accompanied me to my home, then in Annandale, Virginia.  I drove us. Once there, Defendant Gloria James and I had a brief

consensual sexual relationship. Notwithstanding that she'd told me she was in her early twenties, she also advised me - in response to my question whether she was using a barrier contraceptive - that she was a virgin and made it clear she wanted to end that status. I therefore assumed she was using some other type of contraceptive.

6. Later that night I apologized to Defendant Gloria James because I, being tired, thought I might not have satisfied her. Defendant Gloria James seemed surprised but said nothing.

7. Early the next morning, Defendant Gloria James advised me she had to return to Ohio. I asked whether she wanted breakfast or for me to take her to a cousin's home in the District of Columbia whom she had told me she was in town visiting. She said no and that she had to leave. So I took her, pursuant to her request, to a subway station in downtown Washington, D.C.  As we drove there I apologized again for the previous evening. Again, Defendant Gloria James said nothing. I also said, in light of her sudden departure, "You don't seem to like me very much."

8. A few months later in or about June, 1984 I again encountered Defendant Gloria James at DC Space in Washington, DC.  As I entered the establishment, which was a block from my place of employment, a bartender said to me that someone was looking for me and he pointed to her.  I sat down and Defendant Gloria James and I made small talk. I was happy to see her again.  Additionally, I thought her willingness to see me again meant that maybe she had not disliked me after all. She agreed to come see my new apartment inside the city, and so we left DC Space and went there.

9. At my apartment, Defendant Gloria James continued small talk about various minor matters in Akron. I did not listen to any of this carefully and simply smiled. However, after continuing the small talk for awhile she abruptly switched subjects and informed me that she was pregnant. It in no way was visible. She also told me she knew the child was a boy, although she did not suggest how she might have known this and I did not question her.  She then asked to see something with my name written on it. I gave her my business card, which read "Leicester B. Stovell." She asked for confirmation of my middle name. I advised her it is "Bryce." She then said words to the effect of "That's what I thought" and "That's perfect." She then said, "I'm going to name him "LeBron."

10. Defendant Gloria James never specifically said that I was the father. However, I surmised that was what she might have been suggesting since I could think of no other reason for her to disclose such intimate information to me excepting the possibility that she liked

me after all because I had befriended her. I thus was somewhat startled. I thought she had to recall my apology for what I had assumed was my unsatisfying (and incomplete) performance that evening. However, I simply listened, then asked her whether she knew what the name she intended to give her son meant.  In this regard I said, "Is it German or French? What does it mean? The black or the brown? How do you spell it?" In response, Defendant Gloria James spelled it and said "It's only the name of a friend of my cousin's". I said "LeBron", emphasizing the distinction in sound between "le" and "la" in French, then asked whether that person was the father and she laughed and said no. She then switched subjects and returned to making small talk about trivial things she'd been doing in Akron.

11. I was expecting her to provide more information, such as specifically saying I was the father or asking me for advice, but she did not. I found this difficult to interpret.  But I expected her to stay awhile and, once comfortable, to explain everything. However, after several moments, Defendant Gloria James suddenly said she had to leave, once again saying she had to return to Ohio. She also suggested someone was waiting for her, causing me to think we might have been followed since she refused my offer to get a cab.

12. I was disappointed and remained perplexed. I said to her, "I can tell I don't need to ask this, but I have to anyway. I take it that you are going to have the child," intentionally making it a leading question so as not to offend. In response, she said, in no uncertain terms, "I am." I then said, "Well, if he's mine, make sure he plays basketball." It had been a youthful enthusiasm. In this regard, in high school by age 17 (I graduated a year early due to having skipped fourth grade for academic reasons) I had been named an All-League, All-Cleveland, honorable mention All-Ohio and All-America basketball player, the latter by at least two magazines that covered high school athletics, plus had two years of athletic eligibility remaining due to having been out for the season in 9th grade (when I started playing sports) on account of an injury and being ineligible during 10th grade due to having changed high schools between 9th and 10th grades. I did not participate in organized athletics after high school. Additionally, my saying "if he's mine" was an attempt to encourage Defendant Gloria James to amplify.  However, she limited her response to the words, "I will." Incredibly, I then said, "LeBron James, a basketball player from Ohio. That should be easy to remember."

13. I was not certain that Defendant Gloria James thought I had fathered her son. I nonetheless asked whether she could remember my home address. She reacted with seeming surprise, saying she remembered everything, even restating my previous address in Annandale, Virginia.  I therefore felt she knew how to contact me.  However, I

added that my father, whom I told her also is named Leicester Stovell (Leicester Collingwood Stovell Sr.) lives near Akron, in Warren, Ohio. Defendant Gloria James then left. In all, she had spoken to me about her pregnancy for only a few minutes out of the total of perhaps an hour and a half that we were together that evening, from when I met her at D.C. Space until when she left my apartment. After she left I noticed one of my business cards on a table, but did not know whether it was the one I'd given her.

14. About a week after Defendant Gloria James returned to Washington, D.C. in or about June, 1984 and advised me that she was pregnant, I returned to DC Space, the bar restaurant where we'd first met. While speaking to the person tending bar who'd advised me the week before that she was looking for me, I said, "The woman you pointed out to me told me that she's …"  However, before I was able to say "pregnant" he interrupted and said "She's not a woman. She's under age."

15. At first I thought the bartender did not realize to whom I was referring. But he assured me he did. I asked what he meant, and he advised me that she was 15 years old and that he'd let her into the bar to drink sodas only. I, however, did not believe him. Thus, given that Defendant Gloria James never explicitly said I was the father I decided, within a matter of days, to forget all about it, dismissing all of it as some strange joke or misunderstanding unless I heard more.

16. Despite Defendant Gloria James's statements to me (that she was a virgin up until that night in 1984 when we had unprotected sex and that she thereafter was pregnant); what she implied in our conversation (suggesting I had fathered her son by advising me she was going to name him "LeBron," seemingly after me); a reasonable presumption that I had the financial ability to support a wife and child; and my openness to accept such a responsibility (by virtue of ensuring both that Defendant Gloria James would have her child and knew how to get back in touch with me), Defendant Gloria James never contacted me again.

17. On December 30, 1984, public records show that Defendant Gloria James gave birth to Defendant LeBron James in Akron, Ohio. Attached as the Exhibit is Defendant LeBron James's birth certificate.

18. Defendant Gloria James never advised me of Defendant LeBron James's birth. In this regard, Defendant Gloria James did not identify anyone as Defendant LeBron James's father at the time of his birth. Instead, the line for entry of the father's name on the birth certificate was left blank. In light of this apparently deliberate omission, Defendant

LeBron James was given his mother's last name. In addition, I was not informed of Defendant LeBron James's birth by anyone.

RETRIEVAL OF RECOLLECTIONS OF THE 1984 ENCOUNTERS WITH DEFENDANT GLORIA JAMES

19. In or about late 2006 a female acquaintance asked me whether I had a son at Cornell University in Ithaca, New York. I said no. She persisted, asking "Are you sure?" Her suggestion was that I might have a son I did not know about. Consequently, I thereafter systematically explored my memories of every relationship, going year by year starting with college.  When I reached 1984, I thought about Defendant Gloria James from Akron, Ohio for the first time since in or about June, 1984.

20. By late 2006 when I did recall Defendant Gloria James, Defendant LeBron James had been well known for several years. I had heard of him, but that alone had not triggered any recollections on my part. But after I recalled my encounter with Defendant Gloria James I understood there was a possibility that I was Defendant LeBron James's father. This was due to such factors as his height, general appearance, name, and an understanding on my part, in light of my intervening experience, that I possibly had consummated my sexual relation with Defendant Gloria James that night in or about mid-March 1984. I therefore looked into press reports about Defendants' lives in light of my recollections.  During this period of time I discovered that Defendant Gloria James had asserted to the media - while Defendant LeBron James was in high school, being recruited by the National Basketball Association and various corporate sponsors and while public interest in the identity of his father was considerable - that his biological father was an Anthony McClelland.

21. By in or about June 2007 I decided to contact Defendant LeBron James's attorney, Mr. Frederick Nance, the managing partner of the Cleveland office of the law firm Squire, Sanders & Dempsey, to confirm that McClelland was indeed Defendant LeBron James's biological father as Defendant Gloria James had stated to the media. My recollection is that I left a message with Mr. Nance's secretary or on his voice mail after the NBA Eastern Conference finals in 2007, advising him that I wanted to speak with him about an important matter involving his client, Defendant LeBron James, after the NBA championship series between Cleveland and San Antonio. I did not state the issue at that time.

CONTACTING DEFENDANT LEBRON JAMES'S COUNSEL, FREDERICK NANCE

22. I called and actually spoke with Mr. Nance for the first time in or about mid to late June, 2007. My first question was about McClelland. Mr. Nance, however, indicated to me that they'd completed DNA paternity testing of McClelland that eliminated him as Defendant LeBron James's biological father. I therefore informed Mr. Nance of my 1984 encounters with Defendant Gloria James. He asked "Does this mean what I think it means?" I responded that there is a possibility that I am his client's father.  I also requested a meeting with Defendant Gloria James, thinking that a private meeting could be arranged so that we could discuss the matter. However, Mr. Nance immediately said, "I'll have to sit in on that."

23. Also noteworthy here is that Defendant LeBron James and his girlfriend, Savannah Brinson, had a second son in or about mid-June, 2007 whom they named "Bryce." Bryce is my middle name and the name Defendant Gloria James had asked me about during our meeting in or about June, 1984 which had seemed to serve, along with my first name of Leicester, as the basis for her naming of LeBron (it also was the name I primarily was known by in Washington, D.C. from 1990 through 2002). I, however, did not learn of the name of Defendant LeBron James's second son until several months later.

24. Mr. Nance and I exchanged several phone calls from late June through July, 2007. During these conversations, Mr. Nance, among other things, stated to me that Defendant LeBron James is "indifferent" towards the idea of a father, notwithstanding that the father/son relationship naturally is a close and loving one. Indeed, a few months later I read press reports that Defendant LeBron James has stated that he "wants to be a better father than mine was." Moreover, since February 2008 he also has been a spokesperson for a multi-million dollar advertising campaign by a major corporation that's corporate slogan is "it's all about being there." In addition, Defendant LeBron James's own statements, media reports and other circumstances indicate that Defendant Gloria James has suggested to Defendant LeBron James and others that his biological father was uninterested in being his father.

25. Then, in or about mid to late late July, 2007, Mr. Nance called me on my cell phone number and advised me that he had Defendant Gloria James on his line and that she was ready to speak with me at that time. This was a surprise to me.  It had been several weeks since my request and Mr. Nance had not mentioned during the interim whether or how Defendant Gloria James would respond. All he had indicated was that they were doing "due diligence." I nonetheless left the meeting I was in and took the call.

THE JULY, 2007 TELEPHONE CONFERENCE WITH DEFENDANT GLORIA JAMES

26. In the ensuing three way conference call between me, Defendant Gloria James and Mr. Nance, Defendant Gloria James questioned me, in the nature of a carefully prepared cross-examination, for over an hour, asking me for detailed information about our 1984 meetings, who knew about them and what evidence I had. At a couple of points she seemed to me to be on the verge of faltering.  In this regard she stopped talking on a couple of occasions and seemed momentarily to be overcome with emotion.

27. Defendant Gloria James also punctuated the questions and answers with odd remarks, such as "You claim to be LeBron's father but you're not presenting proof. I want exact dates." I told her that I was speaking with sufficient specificity to trigger her own recollections that she should share. Finally, however, Defendant Gloria James stated "we have never met," and that "LeBron's money is for his children." She then threatened me, stating "If you continue with this I will have you harmed, professionally and even physically." This left me confused and amazed. I thought, "If that were the case, why had she spoken to me at all, let alone for the length and in the manner that she had?"

28. Mr. Nance did not interrupt Defendant Gloria James, not even during her threats of harm, notwithstanding that he is the managing partner of one of the country's most influential law firms, has listed securities law (my specialty) as an area of expertise on his professional resumes, and presumptively has contacts in my specialty area both directly and/or through his firm. He asked only a few questions, such as "What happened next?" This left me quite uncomfortable since he did this while I described what had happened during my first encounter with Defendant Gloria James after I had taken her to my home. Mr. Nance also asked whether I recalled any distinctive birthmarks or other identifying anatomical peculiarities of Defendant Gloria James. I said I did not. Not long thereafter, the conference call ended. Mr. Nance, however, advised me that he nonetheless would inform Defendant LeBron James of my interest in having a DNA paternity test.

THE AUGUST 2007 DNA TEST

29.  A few days after the telephone conference with Defendant Gloria James, Mr. Nance advised me that Defendant LeBron James had agreed to take a DNA paternity test with me, notwithstanding his mother's position. I was surprised. But Mr. Nance said he would oversee the arrangements. Thereafter, Advantage Health Care in Cleveland, Ohio was selected as the DNA sample intake facility, and Genetica DNA Laboratories in Cincinnati, Ohio was selected as the testing facility. I drove to Cleveland to have my sample collected

at Advantage by its owner/manager, Sandy Dvorak.  My recollection is that Defendant LeBron James paid his half of the fee and I paid my half. Defendant Gloria James did not participate.

30. Ms. Dvorak refused to inform me even in general terms of what precautions would be taken to ensure the integrity of the DNA collection and testing procedures other than to say "I just do my job." Three other persons were present in her office, including her young (maybe 13) daughter. All seemed aware of why I was there. With respect to the daughter, I overheard her say to Ms. Dvorak, "He can't be LeBron's father. He's too young." Ms. Dvorak responded to her, "He's as old as I am" (i.e., then approximately 52).

31. Ms. Dvorak took my cheek swabs, a photo of my passport, and a photo of me and placed them in an unsealed envelope. However, at one point she placed the unsealed envelope on a table and left the room for approximately five minutes, leaving me and my samples together and unattended.

32. Ms. Dvorak also advised me that she had collected Defendant LeBron James's sample the previous day during a break in a summer basketball practice session at a basketball facility in downtown Cleveland.  My understanding is that it was the team that eventually became the U.S. Olympic "Redeem Team" at the 2008 Olympic Games in Beijing, China and that they were preparing at that time for some games to be played later that summer in Las Vegas, Nevada. She said the players were a raucous group, and that they'd joked extensively with her. For example, she said several of them lifted her up and placed her standing on a chair to take Defendant LeBron James's cheek swabs.

33. As I was leaving Advantage, I noted that I was being trailed by a lightly pigmented black male driving a silver Hummer.  The Hummer fit the description of the Hummer Defendant Gloria James is known to have given to Defendant LeBron James when he was in high school on the verge of signing an NBA contract. The driver's appearance also was consistent with the appearance of photographs I've seen of an Eddie Jackson, a long-time friend of Defendant Gloria James. Mr. Nance had advised me Defendant LeBron James refers to Mr. Jackson as "Dad," although it is known that Jackson is not Defendant LeBron James's father. This also is the same Mr. Jackson with a criminal felony record that includes multiple acts of fraud and racketeering. My impression was that Mr. Jackson intentionally allowed me to see him trailing me in the Hummer. In this regard he sped up near an exit from the highway so that he was parallel to me, then slowed down and looked directly at me with the driver's side window down so that he and the vehicle clearly were visible to me.

34. The DNA samples apparently remained in Cleveland for 4 days before they were transported to Genetica in Cincinnati. The following week I telephoned Ms. Dvorak and she advised me orally, followed by documentation sent by mail to my home address, that the result was a 0% probability of paternity. I spoke with Mr. Nance later that day or the next day, confirming that he'd also received the results. I said, "Maybe I had the wrong 15 year old Gloria James from Akron who planned to name her son LeBron." Mr. Nance responded that "You should not want anything to do with those people" (Defendants Gloria and LeBron James) and that Defendant Gloria James has or had "a fire in her belly."

AFTERMATH OF THE AUGUST 2007 DNA TEST

35. Defendant Gloria James's statements in the telephone conference coupled with the DNA paternity test results caused me to reconsider every aspect of the matter.  During this time, which lasted several months, I also re-reviewed the facts. This included, among other things, obtaining Defendant Gloria James's high school yearbook picture. In this regard, it clearly depicts the then fifteen year old female from Akron, Ohio who called herself Gloria James that I met in Washington, D.C. in 1984. I also read books and articles about Defendant LeBron James's life, and arranged to attend a Cleveland Cavaliers – Washington Wizards game in Washington, D.C. so that I could see Defendant LeBron James in person for the first time. With respect to the latter I called and informed Mr. Nance I'd be at the game and that I'd be seated directly behind the Cleveland Cavaliers bench.

36. I attended the game at Verizon Center in Washington, D.C. on December 5, 2007. When I saw Defendant LeBron James for the first time in person, I was struck by our similarity in appearance. It indeed is consistent with the father/son proposition. Among other things, Defendant LeBron James and I are of nearly if not identical height and pigmentation and have very similar athletic body types. We also share a number of other very similar if not identical physical and facial characteristics.  All are very distinctive in relation to the general population.

37. Others noticed this too. For example, Defendant LeBron James, who was not in uniform due to a finger injury, followed his teammates onto the court along with Daniel Gibson, another Cleveland Cavaliers player. Both looked directly at me behind the Cavalier bench at their first opportunity. At that time I read Mr. Gibson's lips as he said to Defendant LeBron James, "That could be your father." I also noticed this angered Defendant LeBron

James, who seemed to notice I could discern what Mr. Gibson had said. I, of course, had no way to approach Defendant LeBron James that evening beyond my visible presence due to the team's and the arena's security measures. But notably, and disappointingly, Defendant LeBron James made no effort of his own to approach me. I thereafter telephoned and informed Mr. Nance of me and Defendant LeBron James's distinctive similarity of appearance, but Mr. Nance responded, "LeBron looks like the NBA."

38. After seeing Defendant LeBron James at the game in Washington, I decided, due to that, due to what I had concluded were Defendant Gloria James's misrepresentations during the telephone conference, my dissatisfaction with Mr. Nance's DNA paternity test arrangements, Defendants' continuing refusal to cooperate in setting up a more secure test arrangement, and Defendant LeBron James's public statements showing hostility towards his biological father, that I should consider legal action in order to establish the truth.

39. During the 2007 holidays I therefore called a number of attorneys in Ohio in order to obtain legal representation. The first one responded in early January, 2008. However, he advised me that Ohio has a statute of limitations on actions to establish paternity and that the limitation period had ended on Defendant LeBron James's 23d birthday on December 30, 2007, just a couple of weeks beforehand, a few weeks after I had made arrangements to see Defendant LeBron James in person for the first time at the game in Washington, DC, and a little over four months after the August 2007 DNA test.

CASE PREPARATION SINCE EARLY 2008

40. Since early 2008 a number of issues have presented themselves with respect to this matter, such as the extent of equitable review of the establishment of paternity limitation period issue even if delay were due to fraud by the Defendants, evaluating a number of other potentially applicable legal theories, identifying potential witnesses and consulting with numerous attorneys in Ohio, Virginia and the District of Columbia on law and potential representation issues in light of Defendants' conduct. I have researched the legal issues and investigated the factual ones diligently and expeditiously.

41. Among these issues, I looked into the believability of Defendant Gloria James's threats of using force. In this regard, I found that Defendant Gloria James has associated with persons with criminal records that include serious felonies. It appeared that one of these persons followed me from the DNA test site in August 2007. In addition, there have been suggestions of the possibility that Defendants and/or their counsel were made aware of

my efforts to look into this matter by others and even me, advertently or (in my case) mostly inadvertently. Defendant LeBron James's own statements and actions indicating hostility towards his father, which seem to be well-known in northeast Ohio, also appear to have impeded my efforts.

42. My continued efforts to persuade Defendants to resolve this matter also have been to no avail. For example, by an email dated June 10, 2009 Defendant LeBron James once again, through his attorney Frederick Nance, refused to agree to fool-proof DNA testing utilizing the most rigorous safeguards against tampering, notwithstanding the unusual circumstances of Defendant LeBron James. Defendants' effort has not been to establish the truth, but to control the test result.

43. Thus, in light of my accumulation of facts over time, I recently have concluded that a comprehensive, sophisticated and well-funded effort might well have been underway for quite some time, perhaps beginning in its present form as early as when Defendant LeBron James was in high school, to frustrate identification of his real father, and that there is a likelihood that the father in question is me. A key motive and/or enabler of this scheme appears to be Defendant LeBron James's own hostility towards his father. This follows up on Defendant Gloria James's long-term concealment of the identity of the father of Defendant LeBron James since before his birth.

FIRST CAUSE OF ACTION

Common Law Fraud/Misrepresentation, July 2007 Telephone Conference

44. Plaintiff restates the allegations of paragraphs 1 through 43 of the Complaint as if fully restated herein.

45. Defendant Gloria James knew or should have known that Plaintiff would rely on her representations as to the paternity of Defendant LeBron James.

46. Defendant Gloria James intentionally, knowingly, purposefully, willfully, maliciously and in bad faith misrepresented to Plaintiff in their mid to late July 2007 telephone conference that she and Plaintiff did not meet in Washington, D.C. in or about March 1984 and have a consensual one night unprotected sexual relationship.

47. Defendant Gloria James intentionally, knowingly, purposefully, willfully, maliciously and in bad faith misrepresented to Plaintiff in the mid to late July 2007 telephone conference that she had not (i)  returned to Washington, D.C. in or about June 1984 and indicated to

Plaintiff that she had become pregnant, (ii) implied this was the result of her and Plaintiff's previous one night sexual encounter in Annandale, Virginia in or about mid-March 1984, and (iii)  advised Plaintiff during their meeting in Washington, D.C. in or about June 1984 that she thus was going to name her son "LeBron".

48.  Defendant Gloria James intentionally, knowingly, purposefully, willfully, maliciously and in bad faith misrepresented to Plaintiff in their mid to late July 2007 telephone conference that Plaintiff is not the father of Defendant LeBron James and that she and Plaintiff have never met.

49. Defendant Gloria James knew or should have known that her misrepresentations and omissions in the July 2007 telephone conference with Plaintiff relating to the question of whether Plaintiff is the father of Defendant LeBron James were material ones.

50. Defendant Gloria James knew or should have known that Plaintiff would rely on her having made misrepresentations and omissions during the July 2007 telephone conference with Plaintiff to Plaintiff's detriment, irrespective of whether Defendant LeBron James relied on such misrepresentations and omissions. In this regard, such misrepresentations and omissions of Defendant Gloria James deceitfully were intended to induce Plaintiff to accept as reliable the results of the August 2007 DNA paternity testing.

51. Defendant Gloria James's hostile opposition to Plaintiff's efforts towards establishing his paternity is clearly visible in the willfulness of her misrepresentations and omissions in the July 2007 telephone conference and her specific threat to directly or indirectly engage in retaliatory behavior against Plaintiff and, by extension, against any persons willing to cooperate with Plaintiff, if Plaintiff should persist in his attempt to uncover the truth regarding Defendant LeBron James's paternity.

52. Plaintiff did rely on Defendant Gloria James's misrepresentations and omissions in the July 2007 telephone conference. They also forced Plaintiff to expend considerable time, effort and expense to evaluate and thereafter develop means of addressing them, resulting in Plaintiff being unable to meet the deadline to Ohio's statutory limitation period on actions to establish paternity.

53. As a direct and proximate result of Defendant Gloria James's misrepresentations and omissions in the July 2007 telephone conference, Plaintiff has been damaged at law and/or in equity.

SECOND CAUSE OF ACTION
Common Law Fraud/Misrepresentation, August 2007 DNA Test

54. Plaintiff restates the allegations of paragraphs 1 through 53 of the Complaint as if fully restated herein.

55. Defendant Gloria James and and/or Defendant LeBron James knew or should have known that Plaintiff would rely on the results of the August 2007 DNA test involving Plaintiff and Defendant LeBron James with respect to the paternity of Defendant LeBron James.

56. Defendant Gloria James and/or Defendant LeBron James, acting individually, jointly and/or through their agents, intentionally, knowingly, purposefully, willfully, maliciously and in bad faith caused the falsification of the results of the August 2007 DNA test involving Plaintiff and Defendant LeBron James so as to prevent its results from informing Plaintiff that he is the father of Defendant LeBron James.

57. Defendant Gloria James and/or Defendant LeBron James knew or should have known that the falsification of the results of the August 2007 DNA paternity test with respect to the question of whether Plaintiff is the father of Defendant LeBron James was a material one.

58. Defendant Gloria James and/or Defendant LeBron James knew or should have known that Plaintiff and/or others would rely on her, his or their falsification of the results of the August 2007 paternity test with respect to the question of whether Plaintiff is the father of Defendant LeBron James to Plaintiff's detriment.

59. Plaintiff did rely on the results of the falsified August 2007 DNA paternity test. This forced Plaintiff to expend considerable time, effort and expense to evaluate and thereafter develop means of addressing the falsification, causing Plaintiff not to be able to meet the deadline to Ohio's statutory limitation period on actions to establish paternity.

60. As a direct and proximate result of Defendant Gloria James's and/or Defendant LeBron James's falsification of the results of the August 2007 DNA test, Plaintiff has been damaged at law and/or in equity.

THIRD CAUSE OF ACTION

Defendant Gloria James's Long-Term Pattern of Common Law Fraud and
Misrepresentation to Suppress Identification of Defendant LeBron James's Biological
Father

61. Plaintiff restates the allegations of paragraphs 1 through 60 of the Complaint as if fully
    restated herein.

62. Defendant Gloria James knew or should have known that Plaintiff and others would rely
    on her misrepresentations and/or omissions as to the paternity of Defendant LeBron
    James to Plaintiff's detriment.

63. Defendant Gloria James omitted the name of the father of Defendant LeBron James on
    his birth certificate in or about late December 1984, beginning what would become a life-
    long pattern of deceit aimed at preventing identification of Defendant LeBron James's
    biological father to Plaintiff and others, eventually including the public.

64. Among other things, this has included intentionally, knowingly, purposefully, willfully,
    maliciously and in bad faith: (i) misrepresenting to authorities, such as the FHA and ADC,
    that the father of Defendant LeBron James was unknown in order to collect public
    assistance fraudulently; (ii) misrepresenting to Plaintiff that Plaintiff is not the father of
    Defendant LeBron James, and (iii) authorizing and/or aiding and abetting the falsification
    of DNA paternity test results provided to Plaintiff.

65. Additionally, Defendant Gloria James intentionally, knowingly, purposefully, willfully,
    maliciously and in bad faith misrepresented to the news media, the public and/or others,
    beginning in or about 2002 - as media and public interest in the identity of Defendant
    LeBron James's father became considerable - that Defendant LeBron James's father is
    Anthony McClelland, a convicted felon who had been incarcerated multiple times on
    charges including arson and theft. This also was in furtherance of Defendant Gloria
    James's long-term scheme to suppress identification to Plaintiff, the public and others of
    the identity of Defendant LeBron James's father. Moreover, Defendant Gloria James's
    "McClelland misrepresentation" appears designed to end public and commercial interest
    in the identity of Defendant LeBron James's actual father rather than Defendant Gloria
    James's version, which appears to have been fabricated for, inter alia, narrow, one
    dimensional commercial image-making purposes: i.e. to make Defendant LeBron James's

life suggestive of Spike Lee's popular 1998 sports drama film, "He Got Game". Defendant Gloria James's continuation of this scheme, both directly and through her agents, continues through the present day and is ongoing.

66. Defendant Gloria James knew or should have known that her misrepresentations and omissions as part of her long-term scheme to suppress identification of  Defendant LeBron James's actual father to Plaintiff, the public and others were material ones.

67. Defendant Gloria James knew or should have known that Plaintiff, the public and/or others would rely on her misrepresentations and omissions to Plaintiff's detriment.

68. Plaintiff and others did rely on Defendant Gloria James's misrepresentations and omissions.

69. As a direct and proximate result of Defendant Gloria James's long-term willful pattern of fraud, misrepresentation and deceit in order to suppress the identification of Plaintiff as Defendant LeBron James's actual father, Plaintiff has been damaged at law and/or in equity, including, inter alia: (i) depriving Plaintiff of his son for more than twenty-five years; (ii) alienating the natural affections of Defendant LeBron James towards Plaintiff as his father, and the natural affections of LeBron James Jr. and Bryce Maximus James - Defendant LeBron James's two sons - towards Plaintiff as their grandfather; (iii) preventing Plaintiff from sharing personal information with Defendant LeBron James which would be in his best interests, and (iv) diverting commercial opportunities away from Plaintiff, as Defendant LeBron James's real father, which Plaintiff uniquely is situated to optimize.

70. Moreover, Plaintiff had statutory rights in various jurisdictions to establish his paternity of Plaintiff LeBron James in administrative and/or court proceedings. In the state of Ohio, such rights are set forth in the Ohio Uniform Parentage Act under section 3111 of the Ohio Revised Code. Plaintiff would have availed himself of such legal rights but for Defendant Gloria James's deceitful and willful scheme to fraudulently conceal Plaintiff's paternity of Defendant LeBron James.

FOURTH CAUSE OF ACTION

Defendant LeBron James's Involvement in Defendant Gloria James's Long-Term Common Law Fraudulent Concealment of Plaintiff's Paternity of Defendant LeBron James

71. Plaintiff restates the allegations of paragraphs 1 through 70 of the Complaint as if fully restated herein.

72. Defendant LeBron James agrees with, knows of or should know of Defendant Gloria James's long-term fraudulent concealment of the identity of his father, but - due to both anger at perceived abandonment and conflict arising from his image as a fatherless child from the projects who became a multi-millionaire at age 18 - willfully has chosen, since as early as when he reached the age of majority status, to direct and control the concealment, and/or willfully has conspired in it, or willfully, knowingly or recklessly has aided and/or abetted it while attempting to construct a veil of "plausible deniability".

73. As a direct and proximate result of Defendant LeBron James's knowing and/or willful assumption of direction and control of the long-term scheme to conceal fraudulently the identity of his actual father, and/or his knowing and/or willful conspiracy in it, and/or his willfully, knowingly or recklessly aiding and abetting it, Plaintiff has been damaged at law and/or in equity.

FIFTH CAUSE OF ACTION

Common Law Defamation of Plaintiff's Character by Slander by Defendant Gloria James

74. Plaintiff restates the allegations of paragraphs 1 through 73 of the Complaint as if fully restated herein.

75. Defendant Gloria James has intentionally, knowingly, purposefully, willfully, maliciously and in bad faith falsely depicted the character of Defendant LeBron James's actual father to others, and/or directly and/or indirectly the public, or has engaged in a course of conduct tantamount to falsely depicting the character of Defendant LeBron James's actual father: in essence that he should be treated as having the character one might presume for a thief and arsonist who is uninterested in his own children, most specifically Defendant LeBron James. This has exposed Defendant LeBron James's father to such others' (including Defendant LeBron James's) and/or the public's hatred, ridicule and/or contempt. This is ongoing.

76. As a direct and proximate result of Defendant Gloria James's false and defamatory depictions of the character of Defendant LeBron James's actual father, Plaintiff has been damaged at law and/or in equity. This includes the alienation of the natural affections of Defendant LeBron James towards Plaintiff as his father, and the natural affections of LeBron James Jr. and Bryce Maximus James, Defendant LeBron James's two sons,

towards Plaintiff as their grandfather, and by exposing Defendant LeBron James's biological father to public hatred, ridicule, and/or contempt.

### SIXTH CAUSE OF ACTION

Common Law Defamation of Plaintiff's Character by Slander by Defendant LeBron James

77. Plaintiff restates the allegations of paragraphs 1 through 76 of the Complaint as if fully restated herein.

78. Defendant LeBron James intentionally, knowingly, purposefully, willfully, maliciously, in bad faith and/or recklessly has falsely depicted the character of his father to others, and/or directly and/or indirectly the public, and/or has engaged in a course of conduct tantamount to falsely depicting the character of his father to others.

79. Among other things, Defendant LeBron James has stated to the media that "I want to be a better father than mine was." Recently, on "Larry King Live" he also stated that Defendant Gloria James is "a good judge of character".  He even said he's never asked his mother who his real father is, stating this is because "I owe everything to my mother." Such statements, including his commercial endorsements using the corporate slogan, "It's all about being there," reflect Defendant LeBron James's hostility towards his father as being to blame for Defendant's fatherless status, notwithstanding that this is not the case.

80. Such portrayals of his father by Defendant LeBron James over time have formed a pattern that - either in and of themselves or in conjunction with statements of Defendant Gloria James - expose his father to public hatred, ridicule and/or contempt. This is ongoing.

81. As a direct and proximate result of Defendant LeBron James's false and defamatory depictions to others of the character of his father, Plaintiff has been damaged at law and/or in equity.

### SEVENTH CAUSE OF ACTION

Common Law Breach of Oral Contract

82. Plaintiff restates the allegations of paragraphs 1 through 81 of the Complaint as if fully restated herein.

83. In or about late July, 2007, Plaintiff entered into an oral agreement with Defendant LeBron James through his agent and attorney, Frederick R. Nance, to ascertain whether Plaintiff is Defendant LeBron James's father by DNA testing.

84. Defendant LeBron James breached this agreement by, inter alia, intentionally, knowingly, purposefully, willfully, maliciously and in bad faith authorizing and/or knowingly and/or recklessly aiding and abetting the falsification of the results of the August 2007 DNA test while attempting to maintain a veil of "plausible deniability".

85. As a direct and proximate result of Defendant LeBron James's breach of the oral agreement, Plaintiff has been damaged in law and/or equity.

EIGHTH CAUSE OF ACTION
Common Law Tortious Interference with Contract

86. Plaintiff restates the allegations of paragraphs 1 through 85 of the Complaint as if fully restated herein.

87. Prior to the telephone conference between Plaintiff and Defendant Gloria James in or about late July, 2007, there was an expectancy of an agreement between Plaintiff and Defendant LeBron James with respect to determining whether Plaintiff is the father of Defendant LeBron James by, inter alia, DNA testing.

88. Defendant Gloria James was aware of the discussions in the summer of 2007 between Plaintiff and Defendant LeBron James through the latter's attorney, Fred Nance, with respect to ascertaining whether Plaintiff is Defendant LeBron James's father.

89. Defendant Gloria James threatened Plaintiff during the late July 2007 telephone conference, thereby intentionally, knowingly, maliciously and willfully placing Plaintiff in reasonable fear of imminent bodily harm and/or of imminent harm to his professional and financial standing should Plaintiff, inter alia, seek to enforce any agreement between Plaintiff and Defendant LeBron James with respect to ascertaining whether Plaintiff is Defendant LeBron James's father. In threatening Plaintiff, Defendant Gloria James was knowingly, maliciously and willfully interfering with Plaintiff's contractual relations with Defendant LeBron James.

90. Defendant Gloria James's threats were without justification.

91. It appears that Defendant Gloria James thereafter knowingly, maliciously and/or willfully threatened and/or coerced Defendant LeBron James into not fulfilling his part of his bargain with Plaintiff.

92. Defendant Gloria James's actions were detrimental to Plaintiff's contractual relations with Defendant LeBron James and resulted in damage to Plaintiff in law and/or in equity.

### JURISDICTION AND VENUE

93. In accordance with title 28, section 1332 of the U.S. Code, this controversy is between citizens of the different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This is a fair and reasonable choice of Courts for all parties with respect to resolving all issues raised herein.

### STATUTES OF LIMITATIONS

94. This action is brought within the applicable limitation period for each cause of action specified herein.

### NON-AVAILABILITY OF STATE ADMINISTRATIVE REMEDIES

95. The pertinent administrative agencies in Ohio, Virginia and the District of Columbia have advised me that they cannot entertain any proceeding in cases such as the instant matter and that my sole legal option at this time is resort to the court system.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

(a) As to the first cause of action, Plaintiff demands judgment against Defendant Gloria James in the amount of $1,750,000; or

(b) As to the second cause of action, Plaintiff demands judgment against Defendant Gloria James in the amount of $1,750,000, or against Defendant LeBron James in the amount of $1,750,000, or against Defendants Gloria James and LeBron James in the

amount of $2,000,000 jointly and/or severally and equitable relief as this Court deems appropriate, including issuance of an Order that by operation of law would result in legal recognition of Plaintiff's paternity of Defendant LeBron James (notwithstanding any assertion by Defendants that this is barred by equity or the otherwise applicable statute(s) of limitations); or

(c) As to the third cause of action, Plaintiff demands judgment against Defendant Gloria James in the amount of $3,750,000 and equitable relief as this Court deems appropriate, including the equitable relief stated at (b) above; or

(d) As to the fourth cause of action, Plaintiff demands judgment against Defendants Gloria James and LeBron James in the amount of $4,000,000 and equitable relief as this Court deems appropriate, including the equitable relief stated at (b) above; or

(e) As to the fifth cause of action, Plaintiff demands judgment against Defendant Gloria James in the amount of $3,750,000 and equitable relief as this Court deems appropriate, including the equitable relief stated at (b) above; or

(f) As to the sixth cause of action, Plaintiff demands judgment against Defendant LeBron James in the amount of $3,750,000, or demands judgment against Defendants Gloria James and LeBron James jointly or severally in the amount of $4,000,000 and equitable relief as this Court deems appropriate, including the equitable relief stated at (b) above; or

(g) As to the seventh cause of action, Plaintiff demands judgment against Defendant LeBron James in the amount of $1,750,000 and equitable relief as this Court deems appropriate, including the equitable relief stated at (b) above; or

(h) As to the eighth cause of action, Plaintiff demands judgment against Defendant Gloria James in the amount of $1,750,000 and equitable relief as this Court deems appropriate, including the equitable relief stated at (b) above.

Together with punitive damages, plus attorney's fees, interest and costs as justice may require.


Respectfully submitted,

22

Leicester Bryce Stovell

Plaintiff proceeding Pro Se
DC Bar No. 488149
631 12 th Street, N.E.
Washington, District of Columbia
20002-5319
(202) 302-0657 (preferred)
(202) 397-6893

JURY DEMAND

Plaintiff hereby demands a trial by jury.

VERIFY PRESENCE OF ODH WATERMARK          HOLD TO LIGHT TO VIEW

# STATE OF OHIO
# OFFICE OF VITAL STATISTICS

## CERTIFICATION OF BIRTH

**LOCAL FILE NUMBER**      06177                    **DATE RECORD FILED**      FEB 13, 1985

**NAME**      LEBRON RAYMONE JAMES

**DATE OF BIRTH**      DEC 30, 1984                    **SEX**      MALE

**PLACE OF BIRTH**      AKRON

**MOTHER'S NAME**      GLORIA MARIE JAMES

                                                    **MAIDEN**      JAMES

**MOTHER'S BIRTHPLACE**      OHIO

**FATHER'S NAME**      ------------------------------------- --

**Note:**



VOID WITHOUT WATERMARK OR IF ALTERED OR ERASED

VERIFY PRESENCE OF ODH WATERMARK          HOLD TO LIGHT TO VIEW