# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEICESTER BRYCE STOVELL,

 Plaintiff,

  v.

GLORIA M. JAMES *et al.*,

 Defendants.

Civil Action No. 10-1059 (CKK)

## MEMORANDUM OPINION
(September 14, 2011)

  This action was filed by *pro se* Plaintiff Leicester Bryce Stovell ("Stovell") against NBA

basketball superstar LeBron James and his mother, Gloria M. James (collectively, "Defendants")

on June 23, 2010.  Stovell claims that he is LeBron James's biological father and that both

LeBron and his mother Gloria have spread lies about Stovell's paternity, falsified the results of a

paternity test, and made disparaging statements in an effort to silence him.  Stovell asserts claims

against Defendants for common law fraud and misrepresentation, defamation, breach of contract,

and tortious interference with contract.  Defendants have filed a [9] Motion to Dismiss Plaintiff's

Complaint for failure to state a claim upon which relief can be granted, which is opposed by

Stovell.  Stovell has also filed a [14] Motion for Leave to Amend the Complaint, which

Defendants oppose on the ground that the proposed amendment fails to save Stovell's defective

claims.  Finally, Stovell has filed a [16] Request for Leave to File Supplemented Memorandum

in Opposition and Supplemental Points and Authorities, to which Defendants have failed to

respond.  The Court shall grant Stovell's latter motion as unopposed.  However, for the reasons

explained below, the Court shall grant Defendants' motion to dismiss and deny Stovell's motion

for leave to amend.

# I. BACKGROUND

The following facts are drawn from Stovell's Complaint, and the Court must accept them as true for purposes of deciding Defendants' motion to dismiss.

### A.     *Stovell's Initial Encounters with Gloria James*

Plaintiff Leicester Bryce Stovell is an attorney who has resided in the Washington, D.C. area since November 1983.  Compl. ¶ 1.  Defendant Gloria James is a resident of Akron, Ohio and is the mother of Defendant LeBron James.  *Id.* ¶ 2.  In or about mid-March 1984, Stovell met Gloria James at a restaurant/bar in the District of Columbia called "DC Space."  *Id.* ¶ 4.  According to Stovell, Gloria James told him that she was in her early twenties and had a job in Akron.  *Id.*  At the time, Stovell was 29 years old.  *Id.*  After socializing for a few hours, Gloria James went home with Stovell, and they had sex.  *Id.* ¶ 5.  She allegedly told Stovell that she was a virgin.  *Id.*  Early the next morning, Gloria James told Stovell that she had to return to Ohio.  *Id.* ¶ 7.  Stovell dropped her off at a subway station in downtown Washington and apologized to her, believing that he had disappointed her and that she did not like him.  *Id.*

A few months later, around June 1984, Stovell again encountered Gloria James at DC Space.  Compl. ¶ 8.  They spoke briefly inside the bar and then went back to Stovell's new apartment in the city.  *Id.*  While at Stovell's apartment, Gloria James told Stovell that she was pregnant with a baby boy.  *Id.* ¶ 9.  She did not appear pregnant to Stovell.  *Id.*  James asked to see something with Stovell's name written on it, and Stovell handed her his business card, which read "Leicester B. Stovell."  *Id.*  She asked what his middle name was, and Stovell told her it was "Bryce."  According to Stovell, she said something like, "That's perfect," and then told him, "I'm

going to name him 'LeBron.'" *Id.* Stovell asked about the origins of the name "LeBron," and Gloria James reportedly told him it was the name of one of her cousin's friends. *Id.* ¶ 10. Stovell asked if that person was the father of the child, and she said he was not. *Id.* Gloria James never told Stovell that he was the father of her child, but he assumed that was what she was implying. *Id.* Stovell kept expecting her to provide more information or ask for advice, but she did not. *Id.* ¶ 11. After several moments, she told Stovell she had to leave and go back to Ohio. *Id.* Stovell said to her, "I can tell I don't need to ask this, but I have to anyway. I take it that you are going to have the child[?]" *Id.* ¶ 12. Gloria James responded affirmatively. *Id.* Stovell then told her, "Well, if he's mine, make sure he plays basketball." *Id.* Stovell had played basketball during high school. *Id.* James responded simply, "I will." *Id.* Stovell asked her if she could remember his address, and she told him she could; Stovell felt that James would know how to contact him if necessary. *Id.* ¶ 13.

A week after his second encounter with Gloria James, Stovell returned to DC Space. Compl. ¶ 14. The bartender there told Stovell that Gloria James was under age; she had told the bartender she was fifteen years old. *Id.* ¶¶ 14-15. Stovell did not believe the bartender. *Id.* ¶ 15. Ultimately, Stovell decided to forget the entire matter. *Id.* Gloria James never contacted Stovell again. *Id.* ¶ 16. On December 30, 1984, Gloria James gave birth to LeBron James in Akron, Ohio. *Id.* ¶ 17. The line for the father's name on LeBron James's birth certificate was left blank. *Id.* ¶ 18.

      B.    *Stovell Remembers His Encounter with Gloria James and Starts to Believe He Is the Father of LeBron James*

In 2006, an acquaintance of Stovell asked him if he might have a son that he did not know about. Compl. ¶ 19. Upon reflection, Stovell recalled his encounters with Gloria James

back in 1984.  *Id.*  By this time, LeBron James had already become a well-known basketball

player, but Stovell had never previously considered that he might be his father.  *Id.* ¶ 20.  Now,

Stovell thought that there was a distinct possibility that he was, based on his encounters with

Gloria James and similarities in their height and general appearance.  *Id.*  Stovell researched

press reports about LeBron James's upbringing, and he found statements made by Gloria James

indicating that LeBron's biological father was a man named Anthony McClelland.  *Id.*

Around June 2007, Stovell decided to contact LeBron James's attorney, Frederick Nance

("Nance"), to see if he could confirm that Anthony McClelland was in fact the biological father

of LeBron James.  Compl. ¶ 21.  Nance allegedly told Stovell that a DNA paternity test had ruled

out Anthony McClelland as the biological father.  *Id.* ¶ 22.  Stovell told Nance about his

encounters with Gloria James, and he asked for a private meeting with Gloria James to discuss

the matter.  *Id.*  Stovell exchanged several phone calls with Nance throughout June and July

2007, during which Nance told him that LeBron James was "indifferent" towards the idea of a

father.  *Id.* ¶ 24.  A few months later, Stovell read press reports where LeBron James said he

"wants to be a better father than mine was."  *Id.*  Stovell claims that based on LeBron James's

own statements, media reports, and other circumstances, Gloria James suggested to LeBron that

his biological father was uninterested in being a parent.  *Id.* ¶ 24.[1]

Several months after June 2007, Stovell learned that LeBron James had a son whom he

had named "Bryce," which is Stovell's middle name.  Compl. ¶ 23.

C.    *Stovell's Teleconference with Gloria James and the Paternity Test*

In or about mid- to late July 2007, Nance called Stovell to tell him that Gloria James was

_____

[1] Stovell also notes that since February 2008, LeBron James has been a spokesperson for
a major corporation whose corporate slogan is, "it's all about being there."  Compl. ¶ 24.

4

ready to speak with him.  Compl. ¶ 25.  Nance, Stovell, and Gloria James then held a conference call that lasted over an hour.  *Id.* ¶ 26.  Gloria James questioned Stovell about his claims that the two had met in 1984 and asked Stovell to provide proof for his claims of paternity.  *Id.* ¶¶ 26-27.  Gloria James then claimed that she had never met Stovell and told him that "LeBron's money is for his children."  *Id.* ¶ 27.  She also told Stovell, "If you continue with this I will have you harmed, professionally and even physically."  *Id.*  Nance asked Stovell if he recalled any birthmarks or other distinctive physical characteristics of Gloria James, and Stovell said he did not.  *Id.* ¶ 28.  Nance advised Stovell that he would inform LeBron James of his interest in having a DNA paternity test.  *Id.*

A few days after the telephone conference, Nance advised Stovell that LeBron James had agreed to take a DNA paternity test, notwithstanding his mother's position.  Compl. ¶ 29.  Nance made the arrangements for the test.  *Id.*  Stovell paid half the fee, and LeBron James paid the other half.  *Id.*  Stovell drove to Cleveland to have his sample collected at Advantage Health Care by its owner and manager, Sandy Dvorak.  *Id.*  Ms. Dvorak "refused to inform" Stovell what precautions would be taken to ensure the integrity of the DNA collection and testing procedures other than to say, "I just do my job."  *Id.* ¶ 30.  Three other persons were present in the office, including Ms. Dvorak's young daughter.  *Id.*  Stovell overheard the daughter say, "He can't be LeBron's father.  He's too young."  *Id.*  Ms. Dvorak took swabs of Stovell's cheeks, a photo of his passport, and a photo of Stovell and placed them in an unsealed envelope.  *Id.* ¶ 31.  At one point, she left the envelope on a table and left the room for approximately five minutes, leaving Stovell unattended with his samples.  *Id.*  Ms. Dvorak also advised Stovell that she had collected LeBron James's DNA samples the previous day in Cleveland.  *Id.* ¶ 32.

As Stovell left Advantage Health Care, he noticed that he was being followed by a light-skinned black man driving a silver Hummer.  Compl. ¶ 33.  Stovell contends that the Hummer was similar to one that Gloria James is known to have given LeBron James when he was on the verge of signing an NBA contract.  *Id.*  Stovell contends that the driver's appearance was consistent with photographs Stovell has seen of Eddie Jackson, a long-time friend of Gloria James.  *Id.*  Stovell believes that Mr. Jackson intentionally allowed him to see that he was being followed.  *Id.*

The DNA samples remained in Cleveland for 4 days before they were transported to Genetica DNA Laboratories in Cincinnati.  Compl. ¶ 34.  The following week, Ms. Dvorak informed Stovell by telephone that the result of the test was a 0% probability of paternity.  *Id.*  Stovell confirmed that Nance had received the results, and he advised Stovell to stay away from Gloria James because she had "a fire in her belly."  *Id.*

Stovell refused to accept the results of the paternity test.  He researched more about LeBron and Gloria James, and he arranged to attend a Cleveland Cavaliers game so that he could see LeBron in person.  Compl. ¶ 35.  He attended a game on December 5, 2007.  *Id.* ¶ 36.  Upon seeing LeBron, Stovell was struck by the similarity in their appearance.  *Id.*  Stovell claims that they both have the same or similar height, skin color, and body type.  *Id.*  Stovell claims that one of LeBron's teammates, Daniel Gibson, looked at Stovell (who was seated behind the Cavaliers bench) and told LeBron that "that could be your father."  *Id.* ¶ 37.  After seeing LeBron James at this game, Stovell decided that Gloria James was lying about his paternity arrangements, and he decided to consider legal action to establish the truth.  *Id.* ¶ 38.  During the 2007 holidays, Stovell called a number of attorneys in Ohio in order to obtain legal representation.  *Id.* ¶ 39.

The first response he received was in early January 2008.  *Id.*  However, that attorney advised him that the statute of limitations for actions to establish paternity in Ohio ended on LeBron James's 23rd birthday, December 30, 2007.  *Id.*; *see also* Ohio Rev. St. § 3111.05 ("An action to determine the existence or nonexistence of the father and child relationship may not be brought later than five years after the child reaches the age of eighteen.")

## II.  LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. (8)(a), "in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Id.*  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557).  Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S.Ct. 1949 (citing *Twombly*, 550 U.S. at 556).

When considering a motion to dismiss for failure to state a claim, the court "must accept as true all of the factual allegations contained in the complaint."  *Erickson v. Pardus*, 551 U.S.

89, 94 (2007) (per curiam).  "The complaint must be liberally construed in favor of the plaintiff,

who must be granted the benefit of all inferences that can be derived from the facts alleged."

*Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (internal quotation marks omitted).

However, a plaintiff must provide more than just "a sheer possibility that a defendant has acted

unlawfully."  *Iqbal*, 129 S.Ct. at 1950.  When a complaint's well-pleaded facts do not enable a

court, "draw[ing] on its judicial experience and common sense," "to infer more than the mere

possibility of misconduct," the complaint has not shown that the pleader is entitled to relief.  *Id.*

### III.  DISCUSSION

Stovell asserts eight causes of action in his Complaint.  Stovell asserts four claims for

fraud or misrepresentation based on (1) Gloria James's representations during the July 2007

conference call that she did not meet with Stovell in 1984 and become pregnant with his child;

(2) the paternity test results, which Stovell claims were falsified; (3) Gloria James's pattern of

suppressing the identity of Stovell as LeBron James's biological father; and (4) LeBron James's

participation in the scheme to deny that Stovell is his biological father.  He also asserts claims for

defamation based on (1) Gloria James's disparaging comments about LeBron James's biological

father and (2) LeBron James's negative statements about his father.  Stovell asserts a claim for

breach of contract based on the alleged falsification of the August 2007 paternity test and a claim

for tortious interference with contract based on Gloria James's attempts to stop Stovell from

taking a paternity test.  Defendants contend that Stovell has failed to state a claim with respect to

any of these causes of action, and therefore the Complaint should be dismissed.  Defendants

contend that Stovell's proposed Amended Complaint also fails to state a claim, and therefore the

Court should deny Stovell leave to amend.  The Court shall evaluate each of Stovell's claims

below.

      *A.    Stovell's Claims for Fraud*

To succeed on a claim for fraud, a plaintiff must establish: (1) that the defendant made a false representation or willful omission of a material fact; (2) that the defendant had knowledge of the misrepresentation or willful omission; (3) that the defendant intended to induce the plaintiff to rely on the misrepresentation or willful omission; (4) that the defendant actually relied on that misrepresentation or willful omission; and (5) that the defendant suffered damages as a result of his reliance.  *Schiff v. Am. Ass'n of Retired Persons*, 697 A.2d 1193, 1198 (D.C. 1997) (citing *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 706 (D.C. 1981)).[2]  Federal Rule of Civil Procedure 9(b) requires any party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "[T]he pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994) (citation omitted).

      1.    <u>The July 2007 Telephone Conference</u>

Stovell's first claim for fraud is based on Gloria James's representations in July 2007 that she did not meet him in 1984 and that he was not the father of LeBron James.  Defendants contend that this claim must be dismissed because Stovell has failed to sufficiently plead actual reliance on these representations or that he suffered damages as a result of such reliance.  In his Complaint, Stovell avers that Gloria James's representations "forced [him] to expend considerable time, effort and expense to evaluate and thereafter develop means of addressing

---

[2] The parties agree that this Court may apply D.C. law to Stovell's claims for fraud, defamation, and breach of contract.  *See* Pl.'s Opp'n at 3 n.2.

them, resulting in [his] being unable to meet the deadline to Ohio's statutory limitation period on actions to establish paternity." Compl. ¶ 52.  However, this allegation is not legally sufficient to establish reliance for purposes of a fraud claim.

First, being "forced . . . to expend considerable time, effort and expense to evaluate and thereafter develop means of addressing" misrepresentations is reaction, not reliance.  Although Stovell says he was "forced" to spend time and effort to determine whether Gloria James was telling the truth, he does not allege that he was actually compelled to do so by anyone.[3]  Stovell cannot recover damages for expenses he voluntarily decided to incur to challenge the veracity of the statements made by Gloria James.

Second, it is hard to fathom how Stovell could establish that his "reliance" on Gloria James's denials of his paternity were the cause of his failure to file a timely action to establish paternity in Ohio.  Stovell could have filed such an action long before Gloria James denied that he was the father in July 2007.  The facts as pled in the Complaint demonstrate that Stovell in fact did *not* believe Gloria James for very long, since he decided to take a paternity test in August 2007 and concluded by sometime in December 2007 that legal action to establish paternity would be appropriate.  Therefore, by December 2007, Stovell was in the same position he was in before Gloria James denied that he was the father—he had some belief, based on his prior experiences with Gloria James in 1984, that he could be LeBron James's father.  At most, Stovell might have a claim for equitable tolling of the statute of limitations during the period in which he actually believed Gloria James—a period of no more than about five months.  But Stovell never filed any action to try to establish paternity until he filed this lawsuit on June 23, 2010, nearly two and a

---

[3] Stovell makes reference in his Complaint to physical threats made by Gloria James, *see* Compl. ¶¶ 27, 41, but he does not allege that he was assaulted or physically coerced in any way.

half years after the statute of limitations passed.  Therefore, Stovell cannot establish that he

would have filed a timely action to establish paternity but for Gloria James's representations.

Furthermore, Stovell concedes in his opposition brief that he began contacting attorneys

in Ohio "days before Defendant LeBron James's 23d birthday."  Pl.'s Opp'n at 6.  Therefore,

Stovell clearly could have filed a timely action to establish paternity notwithstanding his

"reliance" on Gloria James's alleged misrepresentations.  Although Stovell complains that he did

not hear back from any attorneys until January 2008, he apparently forgets that he is attorney

himself and that he could have proceeded *pro se*, as he has in this action.  Therefore, Stovell's

failure to file a timely action to establish paternity was caused by his own lack of diligence in

pursuing his claim, not by his reliance on the statements made by Gloria James during the July

2007 conference call.  Accordingly, the Court shall grant Defendants' motion to dismiss Stovell's

first claim for fraud.

### 2.    The Allegedly Falsified Paternity Test

Stovell's second claim for fraud is based on the alleged falsification of the results from

the paternity test he took in August 2007.  Defendants contend that this claim should be

dismissed because Stovell has failed to plead the circumstances surrounding the falsification with

particularity as required by Rule 9(b).  Defendants also argue that this claim should be dismissed

for the same reasons as Stovell's first fraud claim—that Stovell cannot establish detrimental

reliance or damages.  The Court agrees with Defendants on both counts.

Stovell alleges generally that Defendants "caused the falsification of the results of the

August 2007 DNA test," Compl. ¶ 56, but he fails to allege any facts the explain how they

allegedly falsified the results.  Based on the facts alleged in the Complaint, the results of the

paternity test were delivered to Stovell orally and in writing by Ms. Dvorak, who is neither named as a defendant in this action nor alleged to have acted as an agent for either Gloria or LeBron James. *See id.* ¶ 15. Therefore, it is unclear what, if any, representations were made to Stovell by either Gloria or LeBron James regarding the results of the paternity test. Such pleading does not comport with Rule 9(b)'s goal of "guarantee[ing] all defendants sufficient information to allow for preparation of a response." *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981).

Stovell also fails to allege reliance beyond what he averred with respect to his first claim for fraud. Because Stovell cannot establish that the allegedly falsified paternity test results caused him any injury, the Court shall grant Defendants' motion to dismiss this claim.

### 3. Gloria James's Alleged Pattern of Deceitful Actions

Stovell's third claim for fraud is based on an alleged pattern of misrepresentations taken by Gloria James to deny that Stovell is LeBron James's biological father. These alleged actions include: omitting Stovell's name on LeBron's birth certificate, misrepresenting to public authorities that LeBron's biological father was unknown in order to obtain public assistance, misrepresenting to members of the news media that Anthony McClelland was LeBron James's biological father, and denying to Stovell that he was the father. *See* Compl. ¶¶ 63-65. Stovell claims that as a result of this alleged pattern of fraudulent activity by Gloria James: he has been deprived of having a son; the natural affections that LeBron James would have for him have been alienated; he has been prevented from sharing personal information with LeBron; and he has been deprived of commercial opportunities that he could take advantage of as the father of a basketball superstar. *Id.* ¶ 69. Defendants argue that Stovell's claim must be dismissed because

he lacks standing to challenge alleged misrepresentations to third parties, he has failed to plead

facts that demonstrate reliance, he has failed to establish damages, and he has failed to plead

fraud with the requisite particularity.

The Court agrees with Defendants that Stovell has failed to plead facts that show that he

actually relied on any of these alleged misrepresentations.  Furthermore, the Court agrees with

Defendants that Stovell cannot recover for the injuries he is claiming to have suffered as a result

of the alleged fraud.  Stovell claims that Gloria James fraudulently deprived him of the

opportunity to bond with his son, earn the affection of his son and grandsons, and share personal

information with his son.  However, the alienation of affections in a parent-child relationship is

not a recognizable form of damages in an action for common law fraud, and neither the District

of Columbia nor Ohio have explicitly recognized such an action.  *See Hinton v. Hinton*, 436 F.2d

211, 212 (D.C. Cir. 1970) ("[A]ncient common law conferred no right of action upon the parent

or child for simple alienation of affections, and it has been so held in the District of Columbia.");

Am. Jur. Parent & Child § 122 ("Generally, a parent has no right of action for alienation of his

child's affections . . . . In an action for another tort, loss of the child's affections does not, in

itself, constitute an element of damage for which recovery is permissible."); *cf. Kane v. Quigley*,

203 N.E.2d 338, 340 (Ohio 1964) ("There is no legal right in a child to maintain such an action

for alienation of affections since that cause of action is based upon the right of consortium.");

*Gleitz v. Gleitz*, 98 N.E.2d 74, 338 (Ohio Ct. App. 1951) ("[N]o such action [seeking recovery by

minor for loss of the affection, companionship, guidance and care of his father] was known to the

common law, and there is in Ohio no statutory authority for the maintenance of such an

action.").[4]   Therefore, Stovell cannot recover for such injuries in his fraud claim.  Similarly,

Stovell's argument that he may recover damages for mental anguish caused by Defendants'

misconduct lacks merit, as such losses are not recoverable in a fraud claim.  *See Day v. Avery*,

548 F.2d 1018 (D.C. Cir. 1976) (per curiam) ("Without a doubt, appellant felt gravely offended

by what he deems wrongdoing by the executive committee, but a sine qua non of any recovery

for misrepresentation is a showing of pecuniary loss proximately caused by reliance on the

misrepresentation.").

With respect to Stovell's claim that he lost commercial opportunities as a result of his

reliance on Gloria James's misrepresentations, the Court agrees with Defendants that his claim is

too speculative to permit recovery.  Stovell does not identify what commercial opportunities he

allegedly lost based on his reliance on Defendants' misrepresentations; he simply claims that

commercial opportunities were "diverted away" from him.  It is well established that uncertain,

contingent, or speculative damages may not be recovered in tort actions.  *See* 25 C.J.S. Damages

§ 38.  Apparently Stovell believes that companies are willing to pay him for being the father of

LeBron James.  However, any such recovery would be wholly speculative.  Stovell also asserts

that he suffered damages in the form of lost gifts that LeBron James would have given him and

damage to his reputation or professional standing.  These claims are also speculative and are not

supported by facts alleged in the Complaint.[5]

---

[4] The Supreme Court of Ohio has recognized a cause of action for loss of filial
consortium by parents whose minor children are physically injured by a third-party tortfeasor.
*See Gallimore v. Children's Hosp. Med. Ctr.*, 617 N.E.2d 1052, 1054 (Ohio 1993).  However,
the court explained that it would limit such actions to "cases where the allegation is one
involving physical injury to a person."  *Id.* at 1055.

[5] Stovell also seeks punitive damages, but he cannot be awarded punitive damages unless
he establishes some other recoverable damages.  *See Chatman v. Lawlor*, 831 A.2d 395, 400 n.8

The Court also agrees with Defendants that Stovell has failed to plead this fraud claim with particularity.  Stovell does not state when or where Gloria James allegedly made the representations at issue (except for those made in the July 2007 conference call).

For these reasons, the Court shall grant Defendants' motion to dismiss Stovell's third claim for fraud.

4.      LeBron James's Participation in the Alleged Pattern of Deceitful Actions

Stovell's fourth fraud claim is based on LeBron James's alleged participation in the pattern of deceitful actions referenced in his third fraud claim.  Stovell's allegations with respect to this claim are the same as for the third fraud claim, and therefore the Court shall dismiss this claim for the reasons stated above.

B.      Stovell's Claims for Defamation

Stovell's fifth and sixth causes of action are for defamation against Gloria James and LeBron James, respectively.  To state a cause of action for defamation, a plaintiff must allege four elements: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.  *Blodgett v. University Club*, 930 A.2d 210, 222 (D.C. 2007).  "A statement is 'defamatory' if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community."  *Clawson*

---

("[E]vidence over and above what is required to establish the underlying tort is necessary for punitive damages.") (quoting *Railan v. Katyal*, 766 A.2d 998, 1012 (D.C. 2001)).  Therefore, Stovell's demand for punitive damages is not sufficient to satisfy this element of his fraud claims.

*v. St. Louis Dispatch, LLC*, 906 A.2d 308, 313 (D.C. 2006) (citation omitted).

        1.      <u>Statements by Gloria James</u>

Stovell's defamation claim against Gloria James is based on the statements she made to third parties disparaging the character of LeBron James's biological father without identifying him by name.  Stovell alleges that Gloria James has "falsely depict[ed] the character of Defendant LeBron James's actual father: in essence that he should be treated as having the character one might presume for a thief and arsonist who is uninterested in his own children." Compl. ¶ 75.  Stovell alleges that these defamatory statements have exposed LeBron James's father to public ridicule and contempt.  *Id.*  Defendants argue that this claim must be dismissed because Stovell has failed to identify the specific statements alleged to be defamatory and because no person who heard the statements could have concluded that they pertained to Stovell. The Court agrees.

"In order to plead defamation, a plaintiff should allege specific defamatory comments by 'plead[ing] the time, place, content, speaker, and listener of the alleged defamatory matter.'" *Caudle v. Thomason*, 942 F. Supp. 635, 638 (D.D.C. 1996) (internal citations omitted).  Stovell has failed to identify any of the specific statements that Gloria James allegedly made about the character of LeBron James's father or the circumstances in which they were made.  Therefore, Stovell has failed to adequately plead his defamation claim.

Furthermore, the Court agrees that Stovell has failed to establish that the allegedly defamatory statements were made about Stovell.  Statements disparaging "LeBron James's father" do not defame Stovell unless the people who heard them could have understood them as referencing Stovell.  *See Harmon v. Liss*, 116 A.2d 693, 695 (D.C. 1955) ("[T]he person

slandered need not be specifically named in the defamatory language as the surrounding circumstances may be such as to leave no doubt in the mind of the hearer as to his identity."); Restatement (Second) of Torts § 564 cmt. a ("It is necessary that the recipient of the defamatory communication understand it as intended to refer to the plaintiff.").  Based on the facts alleged in the Complaint, however, no one other than Stovell or Gloria James could have known that Stovell might be LeBron James's father.  Stovell contends that "some of the statements were made as recently as a few weeks before the filing of the [original] Complaint" and that "it is likely that there are people who connect the dots between the statements and Plaintiff."  Pl.'s Opp'n at 15.  However, because Stovell failed to specifically identify the circumstances surrounding the alleged defamatory statements in his Complaint, he has failed to demonstrate that the statements alleged made by Gloria James concerned him.  Accordingly, the Court shall grant Defendants' motion to dismiss this claim.

2. <u>Statements by LeBRON James</u>

Stovell's defamation claim against LeBron James is based on four statements allegedly made by LeBron: (1) "I want to be a better father than mine was"; (2) his statement that Gloria James is "a good judge of character"; (3) his claim that he has never asked his mother who his real father is because "I owe everything to my mother"; and (4) his commercial endorsements using the corporate slogan "It's all about being there."  Compl. ¶ 79.  Stovell contends that these statements convey LeBron James's hostility towards his father based on the false assumption that his father abandoned him.  *Id.*  The Court agrees with Defendants that, as with the allegedly defamatory statements made by Gloria James, they cannot be interpreted as pertaining to Stovell.

Furthermore, each of these alleged statements is an expression of opinion by LeBron

James.  "[A] statement of opinion is actionable only if it has an explicit or implicit factual foundation and is therefore 'objectively verifiable.'"  *Washington v. Smith*, 80 F.3d 555, 556 (D.C. Cir. 1996) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 22 (1990)).  "[I]f it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable."  *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000) (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993)).  It is clear to this Court that the statements alleged by Stovell to be defamatory are not based on objectively verifiable facts and therefore are not actionable as defamation.  Accordingly, the Court shall grant Defendants' motion to dismiss this claim.

### C.    Stovell's Breach of Contract Claim

Stovell's seventh cause of action is for breach of contract.  Stovell claims that he entered an oral agreement with LeBron James through his attorney in July 2007 to take a paternity test and that LeBron James breached this contract by falsifying the results of the paternity test.  "To prevail on a claim for breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of a contract; (3) a breach of that duty; and (4) damages caused by breach."  *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).  Defendants contend that there was never a valid contract between Stovell and LeBron James to take any paternity test and therefore Stovell's claim fails as a matter of law.

"For a contract to be enforceable, the parties must (1) express an intent to be bound, (2) agree to all material terms, and (3) assume mutual obligations."  *Dyer v. Bilaal*, 983 A.2d 349, 356 (D.C. 2009).  "[E]ven if the parties intend to be bound by an agreement, the court must be

able to determine the terms of the agreement before it can enforce them." *Strauss v. NewMarket Global Consulting Grp.*, 5 A.3d 1027, 1033 (D.C. 2010).  Stovell has failed to plead facts that demonstrate the existence of an enforceable contract.  He generally asserts that he entered an oral agreement with Nance "to ascertain whether [he] is Defendant LeBron James's father by DNA testing."  Compl. ¶ 83.  According to Stovell, LeBron James had agreed to take a paternity test and "Nance said he would oversee the arrangements."  *Id.* ¶ 29.  As alleged, these facts do not suggest that LeBron James intended to be bound or that the parties reached agreement on all material terms.  Considering that LeBron James's agent agreed to take care of all the arrangements for the paternity test, and in light of the circumstances in which the promise was made, the Court cannot conclude that LeBron James manifested an intent through his agent to be contractually bound by his promise.  Accordingly, the Court shall grant Defendants' motion to dismiss Stovell's breach of contract claim.

> D.      *Stovell's Tortious Interference Claim*

Stovell's final claim is asserted against Gloria James for tortious interference with contract.  Specifically, Stovell contends that Gloria James willfully interfered with his contractual negotiations with LeBron James by threatening Stovell during the July 2007 telephone conference.  *See* Compl. ¶ 89.  Stovell also contends that Gloria James thereafter "threatened and/or coerced Defendant LeBron James into not fulfilling his part of his bargain with Plaintiff."  *Id.* ¶ 91.

Stovell urges the Court to apply Ohio law to his claim for tortious interference with contract.  Under Ohio law, "[a] claim of tortious interference with a contract involves the following five elements: (1) the actual existence of a contract or negotiations with regard to a

contract; (2) defendant's knowledge of the contract or negotiations; (3) the defendant's interference in the contract or negotiation; (4) the defendant's conduct was malicious and without legal justification; and (5) damages." *Universal Coach, Inc. v. N.Y.C. Transit Auth., Inc.*, 629 N.E.2d 28, 33 (Ohio 1993). Stovell argues that Gloria James's threats during the July 2007 conference call amounted to interference with his negotiations to get an agreement to take a paternity test. Even assuming that is the case, however, Stovell has not identified any damages that resulted from such interference. Since Gloria James's threats did not stop LeBron James from agreeing to take a paternity test, Stovell cannot establish damages for his claim. Although Stovell also claims that Gloria James later threatened and/or coerced LeBron James into not fulfilling his part of the bargain, this cannot constitute tortious interference with a contract because the Court has ruled that there was no enforceable contract. In any event, the facts as pled in the Complaint suggest that LeBron James did live up to his part of the bargain by providing a DNA sample for the paternity test. Accordingly, the Court shall grant Defendants' motion to dismiss Stovell's tortious interference claim.

　　　　E.　　*Stovell's Motion for Leave to Amend the Complaint*

　　　　Also pending before the Court is Stovell's Motion for Leave to Amend the Complaint. The decision whether to grant leave to amend a complaint is entrusted to the sound discretion of the court, but leave "should be freely given unless there is a good reason, such as futility, to the contrary." *Willoughby v. Potomac Elec. Power Co.*, 100 F.3d 999, 1003 (D.C. Cir. 1996). "[A] district court has discretion to deny a motion to amend on grounds of futility where the proposed pleading would not survive a motion to dismiss." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 945 (D.C. Cir. 2004). Defendants argue that Stovell's proposed Amended

Complaint would not survive a motion to dismiss and therefore that leave to amend should be denied.

The only difference between Stovell's proposed Amended Complaint and his original Complaint is a single sentence that he proposes to add to paragraph 22: "Additionally, Plaintiff offered to submit to DNA testing for paternity status with Defendant LeBron James."  This new factual allegation does not materially change the Court's analysis of Stovell's legal claims as described above.  Therefore, Stovell's proposed Amended Complaint would not survive a motion to dismiss.  Accordingly, the Court shall deny Stovell's motion for leave to amend as futile.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that Stovell has failed to state a claim upon which relief can be granted with respect to each of the causes of action asserted in his Complaint.  The Court also finds that Stovell's proposed amendment to his complaint is futile.  Therefore, the Court shall GRANT Defendants' [9] Motion to Dismiss Plaintiff's Complaint and DENY Stovell's [14] Motion for Leave to Amend the Complaint.  The Court shall dismiss this action in its entirety.  An appropriate Order accompanies this Memorandum Opinion.


_/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge